**United States District Court**
For the Northern District of California

1

2

3

4

5           IN THE UNITED STATES DISTRICT COURT

6           FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    YODLEE, INC.,                              No. C 05-01550 SI

9              Plaintiff,                        **CLAIM CONSTRUCTION ORDER**

10        v.

11   CASHEDGE, INC.,

12             Defendant.
     _____/

13

14        On April 26, 2006, the Court held a claim construction hearing in this case.  Having considered

15   the arguments of counsel and the papers submitted, the Court rules as follows.

16

17                              **BACKGROUND**

18        Plaintiff Yodlee, Inc., has brought suit against defendant CashEdge, Inc., alleging infringement

19   of nine patents: United States Patent Nos. 6,199,077 ("the '077 patent"), 6,633,910 (" the '910 patent"),

20   6,510,451 ("the '451 patent"), 6,802,042 ("the '042 patent"), 6,412,073 ("the '073 patent"),

21   6,594,766 ("the '766 patent"), 6,317,783 ("the '783 patent"), 6,567,850 ("the '850 patent"), and 6,405,245 ("the

22   '245 patent").  Broadly speaking, the nine patents all deal with systems and methods to deliver personal

23   information culled from multiple Internet sources to one central web site.  For example, the technologies

24   at issue allow for an end user to monitor information from several types of accounts held with different

25   financial institutions on one website, without having to individually log into and navigate through each

26   individual website associated with each financial institution with which the user has an account.  The

27   parties now seek to have the Court construe a number of claims from these patents.

28

**LEGAL STANDARD**

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372(1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id* at 1313. "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). "[T]he language of the claim frames and ultimately resolves all issues of claim interpretation." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. However, claims are always read in view of the written description. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6. Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule, that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistent with that limitation. *Id.*

Although not as persuasive as intrinsic evidence, a court may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and

1   inventor testimony, dictionaries, and learned treatises," to determine the meaning of claim language.

2   *Phillips*, 415 F.3d at 1317.  All such extrinsic evidence should be evaluated in light of the intrinsic

3   evidence.  *Id.* at 1319.

4

5                                    **DISCUSSION**

6   **I.    Claim Terms From Yodlee Patents**

7           The Court construes the claims from the '077, '910 , '451, '042, '073, and '766 patents as

8   follows.

9

10          **A.    "Gatherer"/"Gathering Software Agents"/"Gathering Cycle" ('077 and '910**
                    **Patents)**
11
12          Generally speaking, the '077 claims a system and method for accessing a number of Internet

13   sites on behalf of an end user, collecting information from those sites, and automatically downloading

     that information to the end user.  The '910 patent is based on the same system, and claims a system and
14
     method for alerting end users when the information stored on those sites changes.  For example, if a user
15
     has two bank accounts and is able to access those accounts from the Internet, the '077 patent describes
16
     a way to automatically retrieve the user's account balances from the banks' websites.  The '910 patent
17
     provides a way of alerting the user when one of his bank account balances falls below a certain level.
18
     Both patents use the term "gather" to refer the process of collecting the personal information on the end
19
     user's behalf.
20

21
            **1.    '077 Patent**
22
            "Gatherer" and "gathering software agents" appear in both independent claims (claims 1 and 7)
23
     of the '077 patent.  Yodlee construes the terms to mean "a software component and/or related data that
24
     once processed can be employed to locate and retrieve information from Internet destinations based on
25
     user or enterprise request."  CashEdge propose that "gatherer" be construed to mean "a summarization
26
     agent that combines data such that summary is not just an aggregated restatement of the gathered
27
     material, is programmable and is an interactive software application adapted to run on a network
28

3

server." The Court finds that Yodlee's construction accurately describes the function of the gatherer. CashEdge's construction imports dependent claim 3 from the '077 patent, which deals with summarization, into claim 1; this would impermissibly render claim 3 superfluous. *See TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111, 1123 (Fed. Cir. 2001).

"Gathering cycle" also appears in both independent claims of the '077 patent. CashEdge advances a construction for "gathering cycle" that would read "a cycle during which summarization agents, that combine data such that the summary is not just an aggregated restatement of the gathered material, gather and return summary information," while Yodlee asserts that this term needs no construction. The dispute over this term is essentially the same as for "gatherer"/"gathering software agent," for which the Court has determined summarization is not a required component. This term need not be construed.

### 2.   '910 Patent

The '910 patent uses the term "gatherer" in independent claim 1. CashEdge asserts that this element is written in means-plus-function form and is subject to 35 U.S.C. § 112(6). The element does not use the term "means," creating a presumption that it is not subject to § 112(6). *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). This presumption can be overcome if it is demonstrated "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (internal quotation marks omitted). Whether the term brings to mind a particular structure is not dispositive; instead, what is important is whether the term is understood to indicate structure. *Id.* at 1360.

Yodlee has submitted an expert declaration stating that, based upon the use of "gatherer" in the specification, it would have been apparent to someone skilled in the art at the time of this patent that the term "gatherer" referred to a software application. Papakonstantinou Decl. ¶¶ 16-18. The Court does not believe that this is sufficient. The Federal Circuit requires that "*the term* is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure." *Lighting World*, 382 F.3d at 1360 (emphasis added). In fact, the

United States District Court

For the Northern District of California

Federal Circuit implied that a "coined term" such as gatherer would be appropriate for means-plus-function analysis. *Id.* ("[T]he term 'detector, although broad, is still structural for purposes of section 112 ¶ 6 because it is not . . . a coined term lacking a clear meaning such as 'widget' or 'ram-a-fram.'") As it is undisputed that "gatherer" is a "coined term lacking clear meaning," the Court finds that the above element is written in means-plus-function form.

When a term is written in means-plus-function form, the claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. Accordingly, claim 1 is limited to the disclosures for "gatherer" in the '910 patent, col. 14, lines 34-44, and the '077 patent, col. 9, lines 54-64.

### B.   "Gathering Software Agents With at Least One Gatherer Agent Dedicated to Each of the Internet Sites" ('077 Patent)

This term appears in independent claim 1 of the '077 patent. CashEdge argues that this phrase needs no construction once "gathering software agent" and "gatherer" have been construed, while Yodlee advances a construction that would read "in order to effectively locate and retrieve the desired information, a software agent is dedicated to each Internet site. This means an agent containing the necessary site logic or protocols needed to locate and retrieve the desired data from a given site is employed for each site or information provider." Yodlee asserts that this is necessary to make clear that the term "dedicated" does not mean that one gatherer cannot be used for two separate sites if they use the same logic. CashEdge disputes this characterization of the term "dedicated" as being unsupported, and offers an alternate construction that would read "for the gathering software agents, there is at least one gathering agent that is specifically dedicated to each of the Internet sites being accessed." While the term "dedicated" can certainly be read to indicate that each gatherer may only work for one site, the specification indicates otherwise. '077 patent col. 11, lines 55-60. The Court accepts Yodlee's construction.

### C.   "Extracts Data" ('077 Patent)

"Extracts data" appears in independent claim 1 of the '077 patent. Yodlee seeks to construe the

term as meaning to "locate and retrieve data from a web site in a way that allows summarization and/or aggregation," asserting that is necessary to clarify that "extract" means to "copy" data, rather than "to pull out" as would be consonant with the normal definition of the term "extract." CashEdge asserts that this term needs no construction. The Court agrees with CashEdge that no reasonable person, and certainly not someone with ordinary skill in the art, would think that the term "extract" as used in the patent involves erasure. This term need not be construed.

**D.    35 U.S.C. 112 ¶ 6 Claims Made by CashEdge for the '910 Patent**

As with "gatherer" above, CashEdge argues that a number of terms in the '910 patent are written in means-plus-function format and are therefore subject to 35 U.S.C. 112 ¶ 6.

**1.    "Guard" ('910 Patent)**

"Guard" appears in independent claim 1 of the '910 patent. As with the "gatherer" element as used in the '910 patent, the term "guard" is a "coined term" that was not known in the art. The Court therefore finds that it is subject to 35 U.S.C. § 112 ¶ 6. Accordingly, the Court finds that the above element is restricted to the disclosures in the specification of the '910 patent. *See* '910 patent, col. 14, lines 18-64, col. 16, lines 38-47.

**2.    "Notification Alert System" ('910 Patent)**

The '910 patent includes the term "notification alert system" in independent claim 1. The revised joint claim construction brief requests the Court to determine whether the term, which also does not use the word "means," is subject to means-plus-function analysis, and Yodlee's brief argues the point. However, neither CashEdge's brief nor its expert address this term. There is also no admission from Yodlee's expert that this term was coined, as there is for "gatherer." *See* Papakonstantinou Decl. ¶¶ 9, 18. Thus, there is no evidence before the Court that would rebut the presumption against means-plus-function construction. Accordingly, the Court finds that this term is not subject to 35 U.S.C. § 112 ¶ 6.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.      "Data Changes" ('910 Patent)

"Data changes" appears in both independent claims of the '910 patent.  CashEdge asserts that the inventors have acted as their own lexicographer, and expressly defined "data changes" as meaning "data from an Internet site not matching data last accessed from an Internet site," while Yodlee contends that the term "data changes" needs no construction.  The Court agrees with Yodlee; CashEdge's proposed construction does not appreciably differ from the plain and ordinary meaning of "data changes," as any "change" must consist of a difference from a previous state of affairs.  This term need not be construed.

F.      "Communication Device Other Than an Internet-Connected Device" ('910 Patent)

This term appears in both independent claims of the '910 patent.  CashEdge seeks to construe this to mean "a device for sending or receiving information that does not communicate with the Internet either by wireless or non-wireless means," while Yodlee asserts that no construction is necessary.  Alternatively, Yodlee advances a construction that would read "a device that is not connected to the Internet at the time the device receives the notification."  CashEdge asserts that the prosecution history shows that the applicants added this language to overcome prior art by excluding all devices that are capable of connection to the Internet, regardless of whether they are not connected at the time of notification.  However, the cited file wrapper language does not indicate that any device that can connect to the Internet is not included, it only shows that notification via e-mail would constitute notification via an Internet-connected device.  CashEdge Ex. 12 at CE 00003344-45, 00003355.  Furthermore, dependent claim 6 covers wireless communication devices that are "incapable of Internet connection."  Where there are different words used in different claims, there is presumed to be difference in meaning.  *Tandon Corp. v. International Trade Com.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).  The CashEdge construction goes against this presumption by construing "other than an Internet-connected device" as meaning the same thing as "incapable of Internet connection."  The Court construes this term to mean "a device that is not connected to the Internet at the time the device receives the notification."

7

**G.       "Component Tasks"/"Multi-Component Tasks" ('451 Patent)**

The '451 patent describes a system and method that allows for multiple tasks to be performed upon one command from the client, such as a broad user command to "plan a trip" which causes the system to make airline, hotel, and car reservations on its own and return the results of these completed tasks to the user.

The patent uses the term "component tasks" in both its independent claims (claims 1 and 8). Yodlee construes "component tasks" to mean "individual tasks that make up a multi-component task," while CashEdge construes it to mean "the distinct sub-tasks of the multi-component task." The dispute thus centers around the word "distinct." It is not clear to the Court how the addition of the word "distinct" clarifies the meaning of the term "component tasks." The prosecution history cited by CashEdge does not support the addition of the word "distinct." Accordingly, the Court adopts Yodlee's definition.

"Multi-component task" also appears in both independent claims of the '451 patent. Yodlee defines "multi-component task" as "an overall task that is made up multiple individual tasks." CashEdge defines it as meaning "a task that is accomplished by performing two or more distinct sub-tasks in unrelated areas that is more than simply gathering information and presenting the information to the end user." Again, CashEdge cites to prosecution history that does not support its addition of the words "unrelated areas that is more than simply gathering information and presenting the information the end user." There is nothing in the intrinsic evidence to support the limiting language proposed by CashEdge. The Court adopts Yodlee's definition.

**H.       "Data Gathering System" ('042 Patent)**

The '042 patent discloses a system and method for generating reports based on data gathered from multiple Internet sites. "Data gathering system" appears in both independent claims (claims 1 and 8) of the '042 patent. CashEdge asserts in the joint claim construction statement that "data gathering system operating on the portal system, gathering data from multiple Internet sites specifically associated to, and storing secured information person to the requesting user" should be construed as being written in means-plus-function format, although its brief contains no argument on this. Yodlee asserts that it

United States District Court

For the Northern District of California

is not written in means-plus-function form, and proposes that "data gathering system" be construed to mean "a gatherer or software gathering agents, which is a software component and/or related data that once processed can be employed to locate and retrieve information from Internet destinations based on user or enterprise request." The presumption against means-plus-function analysis applies given that the language above is not written in means-plus-function language. In light of this presumption, the Court believes that there is sufficient structure in claim 1 of the '910 patent to establish that the "data gathering system" is software. Accordingly, the Court does not construe this claim in means-plus-function terms.

Yodlee's construction is similar to its construction for "gatherer" from the '077 patent. The Court agrees that the term "data gathering system" is used in this patent to mean the same thing as "gatherer" in the '077 patent. '042 patent, abstract. Accordingly, the Court adopts Yodlee's definition.

## I.      Terms Relating to Reports From the '042 Patent

As mentioned above, the '042 patent claims a method and system of collecting data and presenting "reports" to an end user. CashEdge argues that a "report" must be construed to contain "calculated and solution-oriented results," and may not consist of a restatement of the data collected.

### 1.      "Reports"/"Presenting Reports From the Data" ('042 Patent)

"Reports" and "presenting reports from the data" appear in both independent claims of the '042 patent. Yodlee contends that these terms need no construction. Alternatively, Yodlee proposes that "reports" be construed to mean "presentation of user data to the end user," while CashEdge seek to construe the phrase "presenting reports from the data" as "presenting calculated and solution-oriented results derived from data."

The specification describes the report that is presented to the end user as containing some kind of analysis as opposed to raw data. '042 patent col. 3, lines 18-27, 45-49. Furthermore, the applicant described the report as a "meta-summary" involving interpretation and calculation of data in order to report a solution-oriented result in order to distinguish it from prior art that merely presented data to the end user. CashEdge Ex. 14 at CE 00003509-00003510. The specification repeatedly refers to the report

United States District Court

For the Northern District of California

as consisting of "metasummarized" and calculated data, doing so in descriptions of the invention as a whole, and not just in descriptions of the preferred embodiments. *See, e.g.*, '042 patent abstract; col. 1, lines 22-30.  Accordingly, the Court adopts CashEdge's construction.

### 2.    "Report Algorithm" ('042 Patent)

"Report algorithm" appears in both independent claims of the '042 patent.  Yodlee asserts that this term needs no construction, and alternatively proposes that it be construed to mean "a sequence of operations followed by the system in order to generate a requested report."  CashEdge asserts that this term should be defined to mean "the distinct algorithms for accessing Internet sites to extract raw data relating to the request and for defining the resulting report."  The Court agrees with Yodlee that CashEdge's definition leads one to believe that the report algorithm performs data extraction, which is not the case; the claims make clear that the data gathering system extracts the data according to the needs of the report algorithm.  '042 patent, col. 25, lines 34-43.  Adoption of the term "distinct" is also redundant, as the claims make clear that each report request is associated with its own report algorithm. *Id*. at col. 25, lines 27-30; col. 26, lines 16-20.  However, the Court agrees with CashEdge that definition of report algorithm should refer to its role in data extraction.  In line with one of the dictionary definitions advanced by Yodlee, the Court construes "report algorithm" to mean "a set of rules followed by the system to determine what data is to be extracted by the data gathering system and how that data is to be processed by the report processor in response to a report request."

### 3.    "Report Processor" ('042 Patent)

"Report processor" also appears in both independent claims of the '042 patent.  Yodlee asserts that the term needs no construction, and alternatively proposes that the term be construed to mean "a computing device used to process the gathered data necessary to generate the requested report."  CashEdge asserts that the term should be defined as "a processor that processes raw data according to a report algorithm into meta-summarized information defined by the report algorithm."  CashEdge's definition needlessly involves construing the term "report," which the Court has already construed.  The Court finds that the meaning of this term is clear in light of the surrounding claim language and the construction of "reports" and "report algorithm" and declines to construe "report processor."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

### 4.    **"Report Request"/"User Request" ('042 Patent)**

"Report request" and "user request" appear in both independent claims of the '042 patent. Yodlee again asserts that no construction is needed, while CashEdge proposes a definition that would read "one of a plurality of possible requests each associated with an individual one of a plurality of report algorithms such that the user can request an array of completely different results."    The surrounding claim language makes clear that each report request is associated with one report algorithm. *Id.* at col. 25, lines 27-30; col. 26, lines 16-20.   CashEdge's construction is thus redundant; the Court declines to construe this term.

### J.    **"Personalized Page"/"Stored Personal Pages" ('073 Patent and '766 Patent)/"Personalized Web Page" ('766 Patent)**

The '073 patent describes a system and method for providing an end user with a personalized page containing a list of links to the user's accounts.   The links allow the user instant access to each account through login credentials stored with the personalized page.   The '766 patent contains similar claims to the '073 patent, with the addition of the concept of "user-defined functions," which allow the user to, for example, set the system to update information on the user's personalized page on a periodic basis.

"Personalized page" and "stored personal pages" appear in both the '073 and '766 patents.[1] Yodlee believes that both terms are straightforward and require no construction.   CashEdge disagrees, arguing that both terms should be limited to pages that "provide actual user access to Internet sites without being required to enter additional passwords or codes or other user input."   In other words, CashEdge argues that a "personalized page" or "stored personal page" must take the user to a secured site when the user clicks on the corresponding hyperlink.

CashEdge's proposed limitation has some support in the specification, which provides "[i]n step 58 a user will, minimally, select a URL from his or her bookmarked destinations [in the personalized page], and as is known by hyperlink technology, the transparent URL will be invoked, and the user will

---

[1]"Personalized page" appears in independent claims 1, 18, and 36 of the '073 patent and independent claims 1 and 21 of the '766 patent.  "Stored personal page" appears in independent claims 18 and 28 of the '073 patent, and independent claim 11 of the '766 patent.

11

navigate to that destination *for the purpose of normal user interaction*." '073 patent at col. 9, lines 31-35 (emphasis added); '766 patent, col. 9, lines 38-42 (emphasis added). In addition, the specification also provides that "after transparent log-on to an invoked destination [from a personalized page], the page at the destination is conveyed to and displayed for the user." '073 patent, col. 2, lines 60-62; '766 patent, col. 2, lines 64-66.

Both of these excerpts, however, are descriptions of embodiments of the invention. Because the claim terms themselves are not so limited, it would be inappropriate to "import[] limitations from the specification into the claims." *Phillips*, 415 F.3d at 1323. Accordingly, the Court agrees with Yodlee that these terms need not be construed.

**K.     "Internet Portal (System)"/"Portal Server" ('077, '042, '451, '073, and '766 Patents)**

The concept of an "Internet portal" is central to Yodlee's patents, and the term appears in one of the above forms in every independent claim of the above patents.

**1.     '077 Patent**

For the '077 patent, CashEdge construes "Internet portal" to mean "a website, requiring a username and password entered by the users for access, utilized as an entry point for other web sites," while Yodlee construes it to mean "a website, requiring user authentication, used to connect with Internet destination on behalf of end users and retrieve personal information." The term is described within Claim 1 as extracting personal information from other sites and presenting it to the end user, and not as an entry point for other sites. The Court adopts Yodlee's construction.

**2.     '451 Patent**

For the '451 patent, Yodlee proposes that "Internet portal" be construed to mean "a website, requiring user authentication, used to connect with Internet destinations on behalf of end users and retrieve personal information and/or perform tasks specified by the user." CashEdge proposes that it should mean "a web site utilized as an entry point for other web sites." The components of the Internet portal system are described in claim 1 of each patent, and each involves retrieval of information from

United States District Court

For the Northern District of California

other sites.  '451 patent col. 9, line 50 - col. 10, line 3.  The Court adopts Yodlee's construction, as it is line with this description.

### 3.    '042, '073, and '766 Patents

For the '042, '073, and '766 patents, Yodlee proposes that the Court construe "Internet portal" as "a website, requiring user authentication, used to connect with Internet destinations on behalf of end users," while CashEdge proposes "[a] website, requiring a username and password entered by the user for access, utilized as an entry point for other web sites."  The parties agree that their constructions are very similar; the main point of contention is over whether "Internet Portal" must involve "a username and password" or can involve the broader "user authentication."

The Court adopts Yodlee's proposed construction.  Claim 1 of the '073 patent refers only to a "log on by a user" and does not limit the manner in which the log on is conducted.  Further, the patents refer to means of user authentication other than "a username and password entered by the user."  *See* '073 patent, Abstract (referencing use of "a Smartcard or embedded password" for logging on); '042 patent at col. 10, lines 14-21.  Because the patents do not limit the manner in which as user may log on, the Court adopts Yodlee's proposed construction.[2]

### L.    "Upon Connection with the Destination" ('073 and '766 Patents)

This term appears in independent claims 1, 18, and 36 of the '073 patent and in every independent claim (claims 1, 11, and 21) of the '766 patent.  Yodlee believes that the Court does not need to construe this term, while CashEdge proposes "[c]onnecting the user and the user's appliance to the destination."  The difference between the two parties' constructions is that CashEdge believes that end user's computer must actually connect to the target website, while Yodlee believes that an intermediary computer may be the computer that actually connects.

The Court agrees with Yodlee that this term need not be construed.  The Court agrees with Yodlee that "upon connection to the destination" refers to the portal's connection to the destination.

---

[2]This construction is slightly different from the construction of "Internet Portal" in the '077 and '451 patents.

13

United States District Court

For the Northern District of California

1    CashEdge's attempt to read a limitation into this term is not supported by the evidence.  CashEdge

2    points, first, to the prosecution history, in which Yodlee apparently stated "the user and the user's

3    appliance actually have access to the URL destination WEB page."  Assuming that CashEdge has

4    accurately quoted the prosecution history – its cite is incorrect – the requirement that a user's appliance

5    have access to the destination web page does not mean that the appliance must actually connect to the

6    web page.  CashEdge's second argument relies on the specification, which states that the invention

7    allows a user to "simply select a destination (a hyperlink) in the Password-All list, and the user's

8    browser then invokes the URL for the selected destination."  '073 patent, col. 7, lines 2-4.  CashEdge

9    argues that this passage requires that the browser actually connect to the destination.  But just because

10   the browser "invokes the URL for the selected destination" does not mean that the browser must actually

11   connect to the destination.  Rather, the browser may pass the URL to the portal software.  In addition,

12   this description of the preferred embodiment is not sufficient to limit the description in the claims.  *See*

13   *Phillips*, 415 F.3d at 1323.

14          The Court believes that the plain language of the claim is clear, and therefore declines to

15   construe this phrase.

16

17          **M.    "Page Automatically Provided" ('073 Patent)**

18          This term appears in independent claim 36 of the '073 patent.  CashEdge proposes that this term

19   be construed as "the post log-in page provided without user input."  Yodlee does not oppose this

20   construction, but argues that the plain meaning of the term is clear.  As Yodlee does not oppose

21   CashEdge's proposed construction, the Court adopts CashEdge's proposed construction.

22

23   **II.    Patents Acquired in Merger With VerticalOne**

24          The parties also seek to have the Court construe terms in the three VerticalOne patents: the '783,

25   '245, and '850 patents.  Yodlee asserts that the '783 patent relates to a system and method for delivering

26   personal information from several web sites to the end user via an intermediary computer, while

27   CashEdge asserts that it is limited to a system in which a processor communicates with three separate

28

14

data stores containing information necessary to accomplishing the method.[3]  Yodlee claims that the '850 patent covers the use of an intermediary computer to service user requests and monitor user interaction with the system, while CashEdge asserts that it is more specifically tailored to a method for determining revenue based on accounting data derived from monitoring user requests and interactions.  Finally, Yodlee describes the '245 patent as covering automated access to personal information by allowing the end user to click on a link to a personal information provider; CashEdge asserts that this description does not make it clear that the method is limited to one in which the end user's machine is physically redirected to the personal information provider's web site without any user input.

### A.    "Non-public Personal Information" ('783 Patent)

"Non-public personal information" appears in every independent claim (claims 1, 18, and 20) of the '783 patent.  In *Yodlee v. Block Financial Corp.*, the court adopted H&R Block's proposed construction of the term, construing it to mean "information/data that is specific to an end user and requires verification and access data for retrieval."  Yodlee Exh. V at 6-7.  Yodlee now seeks to have this construction apply in the instant case.[4]  CashEdge argues that this Court should construe the phrase as  "information that is personal to a specific end user and not accessible to the general public."  The Court agrees with CashEdge that its definition is more consistent with the patent's language; nowhere does the patent limit "non-public" to "requir[ing] verification and access data for retrieval."  The *Block* court imposed that construction only because it agreed with H&R Block that "personal information" was specific to an end user, not because anything in the patent or prosecution history required "verification and access data."  Accordingly, the Court adopts CashEdge's proposed construction of "non-public personal information."

---

[3]  The '783 patent has previously been the subject of litigation in which many of the claims at issue here were construed.  Yodlee Ex. V (claim construction order by the District Court for the Western District of Missouri in *Yodlee v. Block Financial Corp.*).

[4]The *Block* court rejected Yodlee's proposal that the phrase be given its ordinary and customary meaning, because it found that during prosecution of the patent Yodlee had included "non-public" to specify that the information was specific to a given end-user.

**B.      "The Processor Retrieving Personal Information . . ." ('783 Patent)**

Claims 1(b), 18(b), and 20(d)(ii) of the '783 patent describe a processor that retrieves "personal information for the selected end user from the connected . . . information provider based on end user data associated with the selected end user and information provider data associated with the connected . . . information providers."   CashEdge seeks to construe this to "require that the processor communicates with a user store including end user data, a provider store including information provider data, and a personal information store including personal information," while Yodlee asserts that no construction is required.  CashEdge bases its construction on language in the specification that it sees as requiring the separate data store arrangement. *See, e.g.*, '783 patent, abstract & col. 3, lines 20-24 ("A system for delivering personal information according to the present invention includes a user store including end user data, a provider store including information provider data, a personal information store including personal information and a processor that communicates with these data stores.").

CashEdge's proposed construction is somewhat troubling because, as Yodlee points out, only claim 20 identifies a "user store" and a "provider store"; claims 1 and 18 refer only to "end user data" and "provider data" and do not explicitly mention a "user store" or a "provider store."  Nevertheless, the Court agrees with CashEdge that the patent requires the use of a user store, a provider store, and a personal information store.  The specification establishes that these components are part of the invention as a whole, and not just part of the preferred embodiment.  '783 patent at col. 3, lines 20-34.  Further, both claims 1 and 18 require the use of "end user data" and "provider data."  Because the patent teaches "automatic aggregation" of personal information, the end user data and provider data must come from a location other than the end user.  Thus, a user store and a provider store must exist in order for the invention to function.  Accordingly, the Court agrees that claims 1 and 18 should be limited in the manner proposed by CashEdge.

**C.      "User Store" ('783 and '245 Patents)**

"User store" appears in independent claim 20 of the '783 patent and independent claim 9 of the '245 patent.  The term was construed by the *Block* court to mean "a storage component accessible by a processor containing information identifying information providers that house personal information

16

United States District Court

For the Northern District of California

1   for a given end user." Yodlee Exh. V at 10-11. Yodlee advances this construction in the instant dispute.

2   CashEdge asserts that this definition impermissibly limits the user store as containing only information

3   identifying information providers, since the patent indicates that the user store also contains

4   "configuration and verification information concerning particular end users." '783 patent col. 5, lines

5   3-5. CashEdge construes "user store" to mean "the storage component that contains the end user data."

6   The Court agrees with CashEdge that any construction of "user store" must encompass verification

7   information for the end user, as the specification indicates that such data is contained in the user store

8   both in general and in the preferred embodiment. *See* '783 patent, col. 5, lines 3-8 ("A user store is also

9   necessary to maintain configuration and verification information concerning particular end users."); '783

10  patent, col. 5, line 57 - col. 6, line 12. The claim language also refers to the "user store" as "storing end

11  user data associated with each end user," including information identifying the information providers

12  "securely storing" the user's personal information. '783 patent, col. 18 lines 33-37. The use of the word

13  "securely" clearly means that verification data is required to access the user's personal information.

14  Accordingly, the Court construes "user store" to mean "a storage component accessible by a processor

15  containing verification data and information identifying information providers that house personal

16  information for a given end user."

17

18          **D.      "Accounting Data" ('850 Patent)**

19          Every independent claim (claims 1, 18, and 21) of the '850 patent contains the term "accounting

20  data." The independent claims each describe a method or system for "monitor[ing] interactions between

21  a personal information provider and an end user of personal information via an intermediary computer

22  to determine revenue derived from the interactions." One step in this process is "updating accounting

23  data associated with the intermediary computer based on the serviced request." CashEdge seeks to limit

24  this phrase as meaning "in response to the serviced request, a processor increments a count for each

25  serviced request or for each new user or increments a commission total for the purpose of determining

26  revenue," claiming that the specification indicates that the manner in which accounting data may be

27  updated is limited to these three ways. '850 patent col. 3, lines 23-25. Yodlee advances constructions

28  only for the terms "intermediary computer" and "accounting data," asserting that no further construction

17

of this phrase is needed.

The specification includes a "summary of the invention" which states that the host computer "may update the accounting data in a variety of ways." It then lists the three methods of counting users, counting transactions, and determining a commission when the request is to perform a transaction, and also states that any combination of these three methods may be used. *See id.* CashEdge's construction impermissibly excludes this combination method, which is also described in the preferred embodiment. *See id.* at col. 3, lines 23-25; *id.* at col. 14, lines 36-38; *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005). CashEdge's approach is also impermissible since it seeks to re-write an entire section of Claim 1. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). As proposed by Yodlee, focus on the terms "accounting data" and "intermediary computer" is more appropriate; construing "accounting data" to include only the three methods described above is in any case the chief concern of CashEdge's proposed construction.

Yodlee proposes that "accounting data" should be construed to mean "data associated with the amount of and/or nature of user interaction." This definition is too broad; while the "Summary of Invention" states that the accounting data may be updated in a "variety" of ways, the language describing those ways indicates that the three outlined methods plus any combination of them are all that is in included in this "variety." The summary language reads as follows:

> The host computer processor may update the accounting data in a variety of ways. First, the host computer may increment a user count for each new user of the intermediary computer over a selected period of time. Next, the host computer processor may count the interactions performed through the intermediary computer. Third, the host computer processor may, where the service request is a request to perform a transaction, increment a commission total an amount based on the serviced request. Finally, the host computer processor may use any combination these ways to update the accounting data associated with the intermediary computer.

Through its use of the terms "first," "next," "third," and "finally," this listing indicates that it is exclusive. Therefore, the Court construes "accounting data" to mean "any combination of data associated with the number of users, number of interactions, and, for service requests to perform transactions, the commissions based on such transactions."

### E.    "Invoice" ('850 Patent)

"Invoice" appears in every independent claim of the '850 patent.  Yodlee construes the term to mean "a description of the amount of and/or nature of user interaction with the system."  CashEdge asserts that this term need not be construed, and if construed should be given its plain meaning of "itemized bill for services."

Within the patent, the term "invoice" is described as being something that is generated based on the updated accounting data.  '850 patent col. 3, lines 35-55; col. 17, lines7-12.  The step of generating an invoice is the final step in "determining revenue," the ultimate goal of the process described in the '850 patent.  It thus follows that the invoice must consist of a bill for money owed, a narrower construction than that put forward by Yodlee.  The Court agrees with Yodlee that there is no reason to read a requirement that the bill be "itemized" into the language.  The Court construes "invoice" to mean "bill for services."

### F.    "In Communication With the Personal Information Provider" ('245 Patent)

This term appears in independent claims 1, 2, 7, and 8 of the '245 patent.  CashEdge asserts that "in communication with the personal information provider" should be construed to mean "the client computer communicates with the personal information provider."  Yodlee asserts that no construction is necessary and that CashEdge's construction is redundant, in response to which CashEdge asks the Court to accept its construction to prevent Yodlee from taking a contrary position later in the case.  The Court agrees with Yodlee that CashEdge's construction is redundant.  The plain language of the claim is substantively identical to CashEdge's proposed construction, making it clear that the client computer communicates with the personal information provider.  '245 patent col. 17, lines 1-6.  The Court therefore declines to construe this phrase.

### G.    "Presenting . . . a Link Corresponding to the Personal Information Stored on the Personal Information Provider" ('245 Patent)

This phrase appears in every independent claim (claims 1, 2, 7, 8, and 9) of the '245 patent. CashEdge proposes that the phrase be construed to mean "displaying on the client computer a hyperlink

19

United States District Court

For the Northern District of California

which the end user can activate to connect to and access the underlying Web page of the provider." Yodlee asserts that this phrase does not require construction, and that CashEdge's construction seeks to import limitations from elsewhere in the independent claims.  For example, claim 1(b) states that "upon activation of the presented link . . . the client computer [is redirected] to a post login page on the personal information provider."  '245 patent, col. 17, lines 7-11.  The other independent claims also contain similar limitations.  The Court agrees that CashEdge's construction does nothing to enhance the understanding of what this phrase means.  CashEdge asserts that this construction makes clear that the purpose of the link is so the client computer can access the underlying web page of the provider, but the claims already makes this clear.  '245 patent col. 17 ll 7-17.  No construction is necessary.

**H.    "Redirects the Client Computer to a Post Login Page on the Personal Information Provider" ('245 Patent)**

This phrase appears in independent claim 1 of the '245 patent.  CashEdge construes this language to mean "redirects the client computer to automatically log onto and be connected to a post-login page on the provider's Web site without user input," while Yodlee again asserts that no construction is necessary.  The Court agrees with Yodlee; read in context, it is clear that the redirection of the client computer to the post login page does not involve further user input other than what has already taken place in the first portion of claim 1(b).  '245 patent col. 17, lines 7-15.  Construing this claim is thus unnecessary, and would needlessly complicate jury instructions at trial.

**CONCLUSION**

For the foregoing reasons and for good cause appearing, the Court adopts the constructions set forth above (Docket Nos. 40, 47).

**IT IS SO ORDERED.**

Dated: July 7, 2006

_____
SUSAN ILLSTON
United States District Judge